IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| YOMEIDA RAMON, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO. C-07-338 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of the Social Security | § | |
| Administration, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION TO
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Yomeida Ramon brought this action for review of the

Commissioner's partially favorable decision awarding a closed period of Title II

Disability Insurance Benefits ("DIB") ending on May 5, 2002.  (D.E. 2).  On

October 19, 2007, defendant answered her complaint.  (D.E. 7).  On November 8,

2007, plaintiff filed a motion for summary judgment with an accompanying brief

in support.  (D.E. 11).  On December 19, 2007, defendant filed a cross-motion for

summary judgment.  (D.E. 17).  On January 16, 2008, plaintiff responded.  (D.E.

18).  For the reasons stated herein, it is respectfully recommended that defendant's

cross-motion be granted.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

## II.  BACKGROUND

### A.    Procedural History.

On October 13, 1998, plaintiff filed an application for DIB beginning on May 18, 1996.  Administrative Record ("AR") at 107-10.  She claimed that she was unable to work due to injuries to her left hand and lower back, and emotional problems.  Id. at 107.  On April 14, 1999, her initial application was denied because her "symptoms [were] not severe enough to be considered disabling under Social Security guidelines."  Id. at 83.  On June 30, 1999, plaintiff's application was denied on reconsideration, after review by an independent state agency physician and disability examiner.  Id. at 86.  This decision also explained that her "symptoms [were] not severe enough to be considered disabling under Social Security guidelines."  Id. at 90.

On July 20, 1999, plaintiff requested that an administrative law judge ("ALJ") review her case.  Id. at 92.  On April 13, 2000, the ALJ held a hearing.  Id. at 41.  On June 30, 2000, the ALJ denied benefits because plaintiff was "able to make an adjustment to other work that exists in significant numbers in the national

2

economy." Id. at 14.  On September 14, 2001, the Appeals Council denied review.

Id. at 5.

On October 29, 2001, plaintiff filed a civil action in this Court.  Ramon v.

Massanari, No. 2:01-cv-00494 (S.D. Tex. July 7, 2002).  Her case was remanded

"so that the commissioner can consider both the opinions of plaintiff's treating

physicians that she is disabled and also the effects of plaintiff's medications on her

ability to work." Id. at 18.  The ALJ held additional hearings on April 9, 2003, and

July 9, 2003.  AR at 265.  On August 26, 2003, the ALJ denied benefits again,

because plaintiff retained "the residual functional capacity for the full range of

'light' work." Id. at 279.

On September 15, 2003, plaintiff requested review by the Appeals Council.

Id. at 306.  On December 28, 2004, the Appeals Council remanded the case to a

different ALJ. Id. at 320.  The new ALJ was ordered to "[g]ive further

consideration to [plaintiff's] maximum residual functional capacity on and prior to

June 30, 2001, and provide the appropriate rationale with specific references to

evidence of record." Id.  He was also to "[o]btain supplemental evidence from a

vocational expert to clarify the effect of the assessed limitations on [plaintiff's]

past relevant work and ... occupational base." Id.

On July 25, 2005, the new ALJ held a hearing.  Id. at 360.  On June 26,

3

2006, he issued a partially favorable decision.  Id. at 262R.  The ALJ awarded

plaintiff a closed period of benefits from May 18, 1996 through May 4, 2002.  He

found that "[o]n May 5, 2002, medical improvement occurred ... and the claimant

has been able to perform substantial gainful activity from that date through the date

of this decision."  Id.  On May 22, 2007, the Appeals Council denied review.  Id. at

262C.  Plaintiff filed this action on August 17, 2007.

**B.     Plaintiff's Medical Records.**

On June 19, 1996, approximately one month after cutting her left little finger

at work, plaintiff saw Dr. G. W. Beckett.  Id. at 242.  She was complaining of

"shooting pain" in her finger that radiated up her left arm.  Id.  Dr. Beckett

cauterized her finger during this visit.  Id.  On June 26, 1996, plaintiff returned,

complaining that her finger still hurt, and that she was unable to use it.  Id.  On July

12, 1996, the same symptoms were still present, and the swelling had increased.

Id.  On July 22, 1996, the finger was still painful, and plaintiff could bend it only a

"minute fraction."  Id.

On March 12, 1997, Dr. Beckett wrote that

> Ms. Ramon was seen in this office regarding pain to her
> left small digit and pain to her lumbar region.  After X-
> rays, examinations, and several office visits, I have found
> Ms. Ramon to be disabled.
> Ms. Ramon has suffered permanent nerve damage to her

4

> left small digit, extending the lateral length of the digit.
> This damage effects [sic] the left arm in that patient is
> unable to grip, lift objects and is unable to perform fine
> finger movements.  This nerve damage is a direct result
> of the injury received while performing her duties and
> can be measured as a 100% disability.
> While at home Ms. Ramon fell in her bathtub, causing
> injury to her lumber [sic] region.  After several office
> visits, MRI of the lumbar spine and a MRI of right hip
> were performed.  This injury is measured as a [sic] 80%
> disability.

Id. at 243.

On October 14, 1997, Dr. Juan Bahamon gave plaintiff a neurological

consultation.  Id. at 234.  Based on her complaints of severe pain, coldness,

discoloration, and shiny skin on her left hand, he concluded that she had Reflex

Sympathetic Dystrophy ("RSD").[1]  Id. at 235.  He referred her to Dr. Scott Overly

to perform sympathetic blocks[2] and to institute "an aggressive program of physical

---

[1] RSD, also known as complex regional pain syndrome, is a chronic neurological
syndrome characterized by severe pain, pathological changes in bone and skin, excessive
sweating, tissue swelling, and extreme sensitivity to touch.  See http://www.rsds.org
/2/what_is_rsd_crps/index.html.

[2] "Sympathetic block" is a synonym for stellate ganglion block.  The stellate, part of the
sympathetic nervous system, is a group of nerves in the neck area.  A stellate ganglion block is
an injection of a local anesthetic (pain-relieving medication) around this group of nerves to
relieve pain to an affected arm.  The pain relief will affect one side of the head and neck, the
upper arm and the upper part of the chest on the same side of the body.  A stellate ganglion block
may be performed to decrease pain and increase the circulation and blood supply.  See
http://www.clevelandclinic.org/health/health-info/docs/2000/2048.asp?index=8300.  Although
used mainly as a diagnostic block, the stellate ganglion block may provide pain relief in excess
of the duration of the anesthetic.  See http://www.medicinenet.com/nerve_blocks/article.htm.

therapy, occupational therapy, and pharmacological intervention to decrease the amount of pain." Id.

On October 23, 1997, plaintiff saw Dr. Overly, who observed that she could not bend her ring finger, or her little finger on her left hand. Id. at 244. Her palm was discolored, and the skin was shiny. Id. Dr. Overly was surprised that she was not suffering more disability in the hand, id., and felt that it was "very possible that this patient could make a good recovery, if treated aggressively." Id. at 245. He administered a left stellate ganglion block, which gave plaintiff "essentially 100% pain relief." Id. Dr. Overly also diagnosed plaintiff with major depression secondary to her chronic pain, and concluded that she would likely need therapy and anti-depressant medication. Id. On October 29, 1997, he opined that the ganglion block had significantly improved her symptoms. Id. at 228. Although she claimed to receive very little benefit from the injection, Dr. Overly saw "quite a change with both the way the hand looks as well as range of motion and lack of sensitivity on exam." Id. at 228-29. Indeed, plaintiff admitted that she had "been experiencing very little pain in the hand itself;" instead, her shoulder and left side were now causing most of her pain. Id. at 228. Dr. Overly performed a total of three stellate ganglion blocks in October and November 1997. Id. at 223, 232, 228.

On March 4, 1998, plaintiff saw Dr. Jose Trevino, who diagnosed her with RSD in her left little finger.  Id. at 198.  On March 10, 1998, and March 23, 1998, he performed cervical epidural blocks.[3]  Id. at 196, 197.  During an April 22, 1998 examination, plaintiff reported that these injections gave her only temporary relief.  Id.  Furthermore, she was suffering a relapse of her RSD.  Id.  Dr. Trevino recommended a series of facet myofascial blocks with a botox injection.  Id. at 194.  He performed the cervical botox procedure on August 7, 1998.  Id. at 193.  He administered another cervical epidural block on January 27, 1999.  Id. at 192.

On March 23, 1999, plaintiff saw Dr. Francisco Acebo for arm and back pain.  Id. at 186.  His clinical impression recorded that she suffered from RSD, low back pain, and depression.  Id. at 189.  He ordered an MRI, which revealed that her lumbar spine was normal.  Id. at 190.  On January 17, 2000, Dr. Raymond Acebo examined her and found normal motor strength, and intact sensory and reflex functioning.  Id. at 202.  A January 20, 2000 MRI showed mild degenerative disc disease in her lumbar spine, with no evidence of herniation, or spinal canal or intervertebral stenosis.  Id. at 203.

---

[3] Similar to the stellate ganglion block, a cervical epidural block involves the injection of steroids, or anti-inflammatories to the cervical spine to control pain to the neck, shoulder, or arms.  See http://www.spineuniverse.com/displayarticle.php/article1171.html.

On November 4, 2002, Dr. Paxton Longwell examined plaintiff.  (D.E. 25, at 438).  His report consists of a two-page evaluation, a completed Social Security Administration assessment form, and the results of two x-rays.  Id.  Plaintiff summarized her medical history for Dr. Longwell:

> The patient states that over the past seven years, she has had pain in her back and hands.  She complains of occasional numbness and weakness in the hands.  She has some pain and numbness in the left leg.  She complains of weakness in the left leg.  She also complains of migraine headaches once per week that responds [sic] to Imitrex.  She complains that when she has a lot of pain, she becomes shaky and tremulous.  She also complains of short-term memory problems.  She cites as an example forgetting conversations and being unable to follow what is going on around her.  She had a recent fall down the stairs and has had more pain since then.  <u>Of all her painful joints and muscles, she feels the left hip is the worst.</u>  She complains that she [sic] residual RSD of the left arm.

Id. (emphasis added).  His examination revealed that

> The patient is a well-nourished, well-developed lady who is in no acute distress....  The patient is awake, alert, and oriented upon exam.  There is no evidence of aphasia or gross memory impairment.  The mental status is intact by history....  The patient has good strength proximally and distally in the arms and legs....  Coordination is intact to finger-to-nose and fine motor movement.  <u>Sensory examination is intact to light touch, pinprick, and</u>

> proprioception.  There is no hyperpathia[4] of the left arm.
> She does not guard the left arm and has good range of
> motion....

Id. at 438-39 (emphasis added).  He then rendered his diagnostic impression:

> Her neurologic examination objectively is normal.
> Specifically, the patient has no significant restriction in
> range of motion across her major joints.  She complains
> of back pain but there is no evidence of atrophy or
> muscle spasm.  The patient has no appreciable joint
> enlargement or obvious effusions.  Her gait and posture
> are normal.  She does not have any motor, sensory, or
> reflex abnormalities with radicular distribution.  She has
> good strength and coordination.  She has no persistent
> disorganization of motor function.  There is no evidence
> of Parkinson's.  She is ambulating without assistive
> device.  We sent her for plain films of the left hip which
> she describes as her most painful joint.

Id. at 439 (emphases added).

Dr. D. C. Ayar took two x-rays of plaintiff's left hip on the same day Dr.

Longwell examined her.  Id. at 440.  He found no evidence of fracture or

dislocation, although minimal degenerative changes were present.  Id.  Except for

minimal degenerative changes and small marginal osteophytes,[5] he found the

examination an "unremarkable study."  Id.  On the Social Security assessment

---

[4] "Hyperpathia" means "abnormally exaggerated subjective response to painful stimuli."
Dorland's Illustrated Medical Dictionary 855 (29th ed. 2000) [hereinafter "Dorland's"].

[5] An "osteophyte" is a bony outgrowth.  Dorland's 1290.

9

form, Dr. Longwell indicated that plaintiff's ability to lift, carry, stand, walk, and sit were not affected.  <u>Id.</u> at 441.  He found no restrictions in plaintiff's postural capabilities or physical functions.  <u>Id.</u> at 442.  He also found that plaintiff was not sensitive to any listed environmental factor.  <u>Id.</u>

On June 23, 2005, Dr. Trevino wrote a letter "to whom it may concern" explaining that plaintiff had seen him for a follow-up examination that day.  <u>Id.</u> at 443.  He was still treating her for RSD in her left hand, and a cervical disc bulge. <u>Id.</u>  The letter does not contain an opinion as to plaintiff's work-related limitations, if any.

**C.    The July 25, 2005 Administrative Hearing.**

On July 25, 2005, the ALJ held a hearing on plaintiff's disability status.  AR at 359.  She was represented by Jay Honeycutt, a nonlawyer representative.  <u>Id.</u> at 361.

Dr. Dick Creamer, the medical expert, testified first.  <u>Id.</u> at 363.  He opined that plaintiff "possibly did meet the listing from 1996 up until she had those ganglion blocks....  And then she received considerable improvement after that." <u>Id.</u> at 364.  He explained that Dr. Longwell's report supported his opinion.  <u>Id.</u> at 365.  The medical expert estimated that plaintiff became able to work about six months before Dr. Longwell's November 4, 2002 examination, because the stellate

ganglion blocks would have taken effect.  Id. at 367.  Plaintiff's representative

pointed out that plaintiff was still receiving epidural injections for pain, and asked

if that could show that the improvement was only temporary.  Id. at 368.  The

medical expert responded

> My understanding, and I've discussed this with one of
> our pain doctors here in San Antonio, and he says that
> after a series of sympathetic ganglion blocks, that the –
> there is improvement, and it's a lasting improvement.
> And they don't have to repeat the stellate ganglion
> blocks.

Id.  He clarified that "that's not the case every time, but that's usually it."  Id.

Petitioner then testified that she had suffered from back pain since 1996

when she slipped and fell while bathing.  Id. at 370-71.  Her continuing epidural

injections did not bring complete relief.  Id. at 371-72.  She claimed that she had

been unable to do anything since she hurt her back.  Id. at 374.  She also explained

that she had been unable to pick up anything with her left hand since cutting her

finger at work in 1996.  Id. at 375.

The vocational expert testified next.  Id. at 376.  She questioned plaintiff on

her work history.  Id.  Plaintiff clarified that she had worked at the HEB deli for

about two months in 1996.  Id. at 377.  In addition to slicing meat and cheese,

plaintiff fried chicken and attended the steam tables.  Id.  She had also worked at

her father-in-law's restaurant as a cashier from 1987 until 1996.  Id. at 379.

The ALJ then posed the following hypothetical:

> I'd like you to assume an individual alleges an onset of
> disability at age 35, last insured at age 40, ninth grade
> education, and her past relevant work history is
> delineated [in the record] and as she's testified hereto.
> For this first hypothetical, I'm going to restrict her to a
> maximum lift and carry of 20 pounds occasionally, ten
> pounds frequently, occasionally climb, balance, stoop,
> kneel, crouch, and crawl.  And for this hypothetical she
> would have reflex sympathy – sympathetic dystrophy of
> the left wrist.  And what I mean by that, unable to close
> the small finger on the left hand with some pain in that
> area.  Light is not limited.  Stand and walk six of eight,
> sit six of eight with the normal break periods.  I'm going
> to restrict her from climbing ladders, ropes, and
> scaffolds, no work at unprotected heights or around
> dangerous, moving machinery.  Within the confines of
> that, my first hypothetical, I ask you whether she could
> perform any of her past relevant work, either as she
> performed it or as it normally would be performed within
> the national economy.

Id. at 381-82.  The vocational expert testified that she would be able to work as a

cashier, or as a deli meat cutter.  Id. at 382.  These jobs were not stressful, or fast-

paced.  Id.  Both jobs could be learned in a short period of time.  Id. at 383.

Because such positions were easy to fill, any person taking unscheduled breaks, or

accruing more than two absences per month would be terminated.  Id. at 382, 384.

However, neither job required fine manipulations with the non-dominant hand, id.

at 385, and many cashier jobs offered a sit/stand option.  Id. at 386.

**D.     The ALJ's Decision**.

On June 26, 2006, the ALJ found that plaintiff was insured through June 30, 2001.  Id. at 262R.  Next, he concluded that she was disabled from May 18, 1996 through May 4, 2002.  Id.  However, on May 5, 2002, due to medical improvement, she became able to perform substantial gainful activity.  Id.  Accordingly, the ALJ terminated benefits on that date.  Id.

The ALJ found that plaintiff suffered from the severe impairment of RSD.  Id. at 262V.  However, her RSD did not meet or exceed a listed impairment.  Id.; see also 20 C.F.R. § 404, Subpt. P, App. 1.  Therefore, he considered the record to determine plaintiff's residual functional capacity ("RFC").  Id.  He considered Dr. Beckett's opinions of March 12, 1997, but did not give them any significant weight because they were "contradicted by the findings and opinions of other physicians."  Id. at 262W.  The ALJ noted that Dr. Bahamon referred plaintiff to occupational therapy on October 14, 1997; he interpreted this as evidence that Dr. Bahamon believed plaintiff could perform some work.  Id.  He also relied on Dr. Overly's treatment notes, which showed marked improvement from October 29, 1997 to December 3, 1997, due to stellate ganglion blocks.  Id. at 262X.  The ALJ pointed out that, on November 19, 1997, Dr. Overly opined that "it does not appear that

13

[plaintiff] has true RSD syndrome ... due to the lack of somatic signs on her extremity."  <u>Id.</u>  Dr. Trevino had also observed that plaintiff's symptoms improved after he administered a left stellate ganglion block on March 4, 1998.  <u>Id.</u>

The ALJ further noted that while Dr. Francisco Acebo diagnosed the claimant with RSD, low back pain, and depression on March 11, 1999, Dr. Raymond Acebo's examinations in January 2000 showed only mild degenerative disc disease in her lumbar spine, and did not mention RSD.  <u>Id.</u> at 262Z.  A January 20, 2000 MRI revealed "no evidence of disc herniation, spinal canal stenosis, or neuroforaminal stenosis that would suggest a neurological basis to [plaintiff's] complaints of lower extremity pain."  <u>Id.</u>  Similarly, Dr. Trevino's progress notes in May and June 2001 showed "little in the way of abnormal physical findings" associated with plaintiff's RSD or migraine headaches.  <u>Id.</u>  Dr. Trevino's July 29, 2002 MRI showed that plaintiff's lumbar spine did not exhibit "herniation or other significant abnormality."  <u>Id.</u>

The ALJ found that Dr. Longwell's November 4, 2002 tests showed "clear objective evidence of medical improvement."  <u>Id.</u> at 262ZB.  Plaintiff's neurological examination was objectively normal, and she exhibited no significant restriction in range in her major joints.  <u>Id.</u> at 262ZA.  Furthermore, an x-ray of plaintiff's hip, supposedly her most painful joint, showed only minimal

14

degeneration, "suggesting her complaints are disproportionate to the objective findings." Id.  Dr. Longwell also felt that plaintiff had no limitations in reaching, handling, fingering, pushing or pulling, seeing, hearing, and speaking. Id.  At the hearing, the medical expert testified that plaintiff's condition had probably not changed in the previous six months. Id.  Accordingly, the ALJ found that plaintiff experienced marked improvement beginning on May 5, 2002. Id.

The ALJ further found that plaintiff's statements regarding the intensity, duration, and limiting effects of her symptoms were not credible after that date. Id. at 262ZC.  He noted that

> it does not seem reasonable to conclude from the minimal findings in evidence that [plaintiff's condition] could be the basis for the degree of pain alleged.  She does not appear to be experiencing progressive physical deterioration which might be expected when there is intense and continuous pain.  Likewise, the claimant's routine does not appear restricted by her alleged disability, rather by choice.

Id.  The ALJ determined that plaintiff's medical improvement increased her functional capacity for basic work activities, id., and that her period of disability had ended on May 5, 2002, the day she became able to return to her past job as a cashier. Id. at 262ZD.

## III.  LEGAL STANDARDS

**A.      Social Security Act Disability Insurance Benefits Requirements.**

The Social Security Act establishes that every individual who is insured for DIB, has not attained the set retirement age, has filed an application for disability benefits, and is under a disability is entitled to receive disability benefits.  42 U.S.C. § 423(a)(1).  A person is under a disability when he cannot "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Act establishes that a claimant is not disabled if that person can perform jobs available in the national economy:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence ... "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

16

42 U.S.C. § 423(d)(2)(A).

**B.     Social Security Administration Regulations And Rulings.**

The Social Security Administration uses a five-step sequential process to determine if an individual suffers from a disability.  20 C.F.R. § 404.1520.  A disability finding at any point in the five-step process is conclusive and ends the analysis.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990) (citation omitted). A claimant bears the burden of proof on the first four steps.  Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citation omitted).  A claimant must prove that (1) she is not presently engaged in substantial gainful activity; (2) she suffers from an impairment or impairments that are severe; and that either (3) the impairment meets or equals an impairment listed in the appendix to the regulations; or (4) due to claimant's RFC, the impairment prevents the claimant from doing past relevant work.  20 C.F.R. § 404.1520(a)(4); see also Bowling, 36 F.3d at 435; Villa, 895 F.2d at 1022.

The Fifth Circuit has held that "[t]he first two steps involve threshold determinations that the claimant is not presently engaged in substantial gainful activity and has an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities."  Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  The Commissioner may find that a claimant's

impairment fails to meet the significant limitation requirement "'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" Id. at 391 (quoting Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985)).

Step three requires a claimant to prove that her impairment meets one or more of the impairments listed in the regulations. See 20 C.F.R. § 404, Subpt. P, App. 1. The list includes both physical and mental impairments. The criteria for mental impairments take into account whether there is marked interference with activities of daily living, social functioning, concentration, persistence, or pace, and whether the claimant has suffered repeated episodes of decompensation. 20 C.F.R. § 404, Subpt. P, App. 1, Part A § 12.00(C). The regulation defines "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." Id. at Part A § 12.00(C)(4). The claimant must present evidence that the impairment is a long-term problem rather than a temporary set-back, but "does not have to show a 12 month period of impairment unmarred by any symptom-free interval." Singletary

18

v. Bowen, 798 F.2d 818, 821 (5th Cir. 1986) (citations omitted).

Pursuant to the fourth step, if necessary, a claimant who is unable to show that her impairment meets one of the listed impairments must show that she is unable to perform her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The Commissioner considers the claimant's RFC in making this determination.  Id.; see also 20 C.F.R. § 404.1545.  The RFC describes the most a claimant can do despite any limitations caused by an impairment.  20 C.F.R. § 404.1545(a)(1).  The Commissioner is to consider all relevant record evidence, including medical and non-medical evidence, when making an RFC determination.  20 C.F.R. § 404.1545(a)(3).

If the claimant makes the required step four showing, the burden shifts to the Commissioner to determine, based on the claimant's RFC, age, education, and work experience, whether the claimant can make an adjustment to other jobs present in the national economy in significant numbers.  20 C.F.R. § 404.1520(a)(4)(v).  If she cannot make such an adjustment, the claimant is disabled.  Id.

When the Commissioner awards a closed period of disability, he bears the burden of demonstrating medical improvement before the cessation date.  Waters v. Barnhart, 276 F.3d 716, 718-19 (5th Cir. 2002); 20 C.F.R. § 404.1520(a)(5).

19

The medical improvement analysis requires a sequential evaluation.  20 C.F.R.

§ 404.1594(f).  At step one, the claimant will be found not disabled if she is

engaging in substantial gainful activity.  Id.  At step two, the claimant is disabled if

she has an impairment, or combination of impairments, that equals or exceeds the

severity of a listed impairment.  Id.  At step three, the Commissioner determines

whether the claimant has experienced medical improvement.  Id.  If she  has, then

in step four the Commissioner must determine whether that improvement is related

to the ability to do work.  If not, or if there has been no improvement at step three,

the Commissioner must consider whether any listed exceptions apply at step five.

Id.

If the claimant has experienced medical improvement related to the ability to

do work, or if one of the listed exceptions applies, the Commissioner must

determine whether the claimant's impairments, considered together, are severe.  Id.

If the claimant's impairments are severe, the Commissioner must determine

whether they prevent the claimant from returning to past relevant work.  Id.  If they

do, the Commissioner must determine whether the claimant can perform other

work, considering age, education, and past work experience.  Id.

**C.      Judicial Review Of The ALJ's Decision.**

Judicial review of the Commissioner's denial of DIB is limited to two

questions: (1) whether substantial evidence supports the Commissioner's decision;

and (2) whether the decision complies with relevant legal standards.  Carey v.

Apfel, 230 F.3d 131, 135 (5th Cir. 2000) (citations omitted).  When fixing the

termination date for a closed period of benefits, the Commissioner bears the burden

of showing that substantial evidence demonstrates that (1) there has been work-

related medical improvement, and (2) the claimant is now able to engage in

substantial gainful activity.  Joseph v. Astrue, 231 Fed. Appx. 327, 329 (5th Cir.

2007) (per curiam) (unpublished) (citing 42 U.S.C. § 423(f); 20 C.F.R.

§ 404.1594(a)).  Substantial evidence is "'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'"  Richardson v. Perales,

402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S.

197, 229 (1938)); accord Carey, 230 F.3d at 135 (citation omitted).  The Fifth

Circuit has described this burden as more than a scintilla, but less than a

preponderance.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).  A finding of

"no substantial evidence" occurs "only where there is a 'conspicuous absence of

credible choices' or 'no contrary medical evidence.'"  Johnson v. Bowen, 864 F.2d

340, 343-44 (5th Cir. 1988) (per curiam) (citation omitted).

In applying the substantial evidence standard, courts are to scrutinize the record to determine whether such evidence is present.  However, they may not reweigh evidence, try issues <u>de novo</u>, or substitute their own judgment for the Commissioner's.  <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).  Factual conflicts in the record are for the Commissioner to resolve, not this Court.  <u>Masterson v. Barnhart</u>, 309 F.3d 267, 272 (5th Cir. 2002).  The Court, like the ALJ, must consider the evidence as a whole and take into account the following factors: "1) objective medical facts; 2) diagnoses and opinions of treating and examining physicians; 3) claimant's subjective evidence of pain and disability; and 4) claimant's age, education, and work history."  <u>Wren v. Sullivan</u>, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam) (citation omitted).

## IV.  DISCUSSION

**A.     The Commissioner's Decision Is Supported By Substantial Evidence.**

Plaintiff argues that the Commissioner's decision is not supported by substantial evidence.  (D.E. 2, at 5).  Specifically, she contends that (1) the medical expert's testimony should be disregarded because he surrendered his license to practice medicine on August 24, 2007, (D.E. 11, at 3); and (2) the medical expert's testimony was speculative, and unsupported by the record, which shows that she lacked the RFC to perform light work.  <u>Id.</u> at 7; (D.E. 2, at 5).

22

When fixing the termination date for a closed period of benefits, the Commissioner "in all relevant respects" bears the burden of supporting with substantial evidence the necessary findings that (1) there has been work-related medical improvement, and (2) the claimant has become able to engage in substantial gainful activity.  Joseph, 231 Fed. Appx. at 329 (citations omitted) (applying "medical improvement" test to closed benefits period cases); see also 42 U.S.C. § 423(f)(1); 20 C.F.R. § 404.1594.  A determination that there has been improvement must be based on the symptoms, signs, or laboratory findings associated with a claimant's impairment.  20 C.F.R. § 404.1594(b)(1); see also 20 C.F.R. § 404.1528 (a "symptom" is an applicant's own description of an impairment; a "sign" is an abnormality that can be shown by medically acceptable clinical diagnostic techniques; a "laboratory finding" is a phenomena which can be shown with medically acceptable laboratory diagnostic techniques).

## 1.    The Medical Expert's Testimony is not per se Unreliable.

Plaintiff argues that the medical expert's testimony is unreliable because, on August 24, 2007, Dr. Creamer voluntarily surrendered his medical license rather than face discipline for prescribing controlled substances to himself, his family, and former patients without maintaining adequate records.  (D.E. 11, at 3).  She contends that "the judgment of the physician could well have been impaired and

23

therefore the credibility of his testimony and his judgment regarding medical improvement is questionable and should be disregarded." Id.  However, she offers no support for the proposition that the opinion of a consulting physician must be disregarded, and a new hearing granted, if the physician later surrenders his license in lieu of discipline.  Furthermore, she does not allege that the medical expert was impaired during the hearing, much less identify or adduce any evidence to that effect.  Indeed, she has not established that the medical expert had even engaged in any wrongful conduct around the time of the July 25, 2005 hearing, or that he has ever abused prescription drugs.[6]  Accordingly, it is respectfully recommended that the medical expert's testimony was competent evidence.

## 2.    The ALJ's Decision is Supported by Substantial Evidence.

Plaintiff next argues that the medical expert's "opinion appears to be speculative in nature and there is nothing in [the] file to support medical improvement as of six (6) months prior to November 14, 2002."  (D.E. 11, at 7).  The medical expert felt that plaintiff's improvement was caused by sympathetic ganglion blocks, which usually result in lasting improvement.  AR at 368-69.  While the medical expert was not certain as to when plaintiff was treated, he

---

[6] Significantly, in a press release explaining its most recent suspensions, the Texas Medical Board did not note that Dr. Creamer had given any non-therapeutic prescriptions, or that he was impaired.  See http://www.tmb.state.tx.us/news/press/2007/083007a.php.

clearly believed that she improved afterwards.  The ALJ terminated benefits

effective May 5, 2002, six months prior to Dr. Longwell's examination, on the

basis of the medical expert's testimony that "[Dr. Longwell's] examination was

done after she had received the stellate ganglion blocks, and was improved.  So the

date of improvement probably would extend maybe six months prior to that.  I

really don't know when those stellate ganglion blocks were done."  AR at 368.  Dr.

Longwell's report includes clinical and laboratory findings to support his

conclusion that plaintiff's ability to work was no longer impaired, and is

substantial evidence that plaintiff's period of disability had ended by November 4,

2002.  (D.E. 25, at 439-42); see also 20 C.F.R. § 404.1513(b) (medical reports

should include clinical and lab findings).

The medical expert apparently believed that plaintiff had a series of three

ganglion blocks in August of 2000.  Id. at 364.  However, he seems to be referring

to the series of cervical blocks recommended by Dr. Trevino on April 22, 1998.

Id. at 194.  The record indicates that plaintiff's last block procedure was on January

27, 1999.  Id. at 192.  The medical expert could also be referring to the stellate

ganglion blocks that Dr. Overly performed in October and November of 1997.  Id.

at 223, 228, 232.

The medical expert's error, if any, is not prejudicial.  His opinion was that, if

plaintiff's stellate ganglion blocks were performed in August of 2000, and she showed significant improvement in November of 2002, she would have begun to experience the same level improvement at least six months before in May 2002. According to the medical expert, stellate ganglion blocks may take up to twenty months to reach their maximum therapeutic effect.  If the expert's analysis is applied to plaintiff's actual ganglion block treatments, completed in November 1997, it predicts complete effectiveness by July 1999.  Thus, a reasonable mind could accept the expert's testimony as sufficient evidence that plaintiff's period of disability had ended by May 2002.  Accordingly, it is respectfully recommended that the Commissioner's decision to terminate benefits effective May 5, 2002 is supported by substantial evidence.

## B.    The Commissioner Complied With Relevant Legal Standards.

Plaintiff also argues that the decision does not comply with relevant legal standards.  She argues that the Commissioner improperly (1) failed to find her disabled under the Grid Rules, 20 C.F.R. 404, Subpt. P, Appx. 2, § 200 et seq., (D.E. 2, at 5); (2) refused to consider evidence that her disability was ongoing, (D.E. 11, at 3); (3) allowed the medical expert to give hearsay testimony regarding the efficacy of ganglion blocks, id. at 6; (4) failed to incorporate plaintiff's back or hip pain, or the side effects of her medication, in his hypothetical to the vocational

26

expert, <u>id.</u> at 7; (5) used the Dictionary of Occupational Titles ("DOT") entry for "cashier" as her past relevant work, <u>id.</u> at 10; and (6) did not properly evaluate the disabling effects of her pain.  (D.E. 18, at 2-3).

### 1.    The ALJ's Failure to Find Plaintiff Disabled Pursuant to the Medical-Vocational Guidelines was not Error.

Plaintiff claims first that the ALJ failed to correctly apply the grid rules to her case.  (D.E. 2, at 5).  However, the Fifth Circuit has explained that "[u]se of the 'Grid Rules' is appropriate when it is established that a claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity."  <u>Crowley v. Apfel</u>, 197 F.3d 194, 199 (5th Cir. 1999).  Plaintiff complains of disabling pain.  Pain is non-exertional impairment that, if present, requires the ALJ to rely on expert vocational testimony rather than the medical-vocational guidelines.  <u>Scott v. Shalala</u>, 30 F.3d 33, 35 (5th Cir. 1994) (citations omitted).  Therefore, it is respectfully recommended that this claim is meritless.

Plaintiff next complains that the ALJ "basically refused to accept medical reports and testimony that tended to show that the conditions which began in 1996 were continuing and ... prevented plaintiff from working."  (D.E. 11, at 4).  After plaintiff's representative elicited testimony regarding her current condition, the

27

ALJ explained that

> [The Appeals Council's remand order] says, "The
> Decision does not contain rationale as to why she should
> not have returned to her past relevant light work as a
> delicatessen or restaurant manager.  On remand, the ALJ
> will give further consideration to Claimant's maximum
> residual functional capacity on and prior to June 30, of
> 2001."  So I realize that she might have these problems
> now, but I have to consider the timeframe prior to the
> date last insured....  So it's nice to know what she's
> capable of doing now, but that's not going to really help.

AR at 372.  The ALJ further explained that evidence of plaintiff's limitations after

her last insured date "does no good now, unless she was continually disabled all

the way through."  Id. at 373.

The record does not indicate that the ALJ refused to admit any testimony, or

medical records, offered at the hearing into evidence.  Instead, he urged plaintiff's

representative to address the medical expert's testimony, which had already been

introduced.  Thus, the ALJ may have actually helped him by identifying the

primary weakness in plaintiff's case.  Furthermore, plaintiff has not shown what

evidence she would have introduced, or how the ALJ's refusal to allow it has

prejudiced any substantial right of hers.  See Audler v. Astrue, 501 F.3d 446, 448

(5th Cir. 2007) ("'Procedural perfection in administrative proceedings is not

required' as long as 'the substantial rights of a party have not been affected.'")

(quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam)).

Therefore, it is respectfully recommended that this claim is without merit.

### 2.    The ALJ did not Improperly Admit Hearsay Evidence.

Plaintiff further alleges that the medical expert impermissibly "bas[ed] his

opinion of medical improvement on the information learned from an unidentified

third source whom he does not name, whom we have not had the opportunity to

cross examine and whose medical expertise is unsubstantiated."  (D.E. 11, at 6);

see AR 368 (medical expert explains that he asked another doctor about ganglion

blocks).  The Supreme Court has explained that "strict rules of evidence, applicable

in the courtroom, are not to operate at social security hearings so as to bar the

admission of evidence otherwise pertinent."  Richardson, 402 U.S. at 400.  Indeed,

the Richardson Court held that, in a social security hearing, hearsay "is thus

admissible up to the point of relevancy."  Id. at 410; see also Calderon-Ontiveros v.

I.N.S., 809 F.2d 1050, 1053 (5th Cir. 1986) (hearsay admissible in administrative

proceedings) (citations omitted); 42 U.S.C. § 405(b)(1) ("Evidence may be

received at any hearing before the Commissioner of Social Security even though

inadmissible under rules of evidence applicable to court procedure.").

Accordingly, it is respectfully recommended that this claim lacks merit.

### 3.     Any Error in the ALJ's Hypothetical is Harmless.

Plaintiff's next claim is that the ALJ's hypothetical did not fully incorporate all of her limitations.  (D.E. 11, at 7).  A vocational expert's testimony is not required where, as here, an ALJ concludes that a claimant can return to her past relevant work.  Williams v. Califano, 590 F.2d 1332, 1334 (5th Cir. 1979) (per curiam) (citation omitted).  Accordingly, it is respectfully recommended that any error in the ALJ's hypothetical did not prejudice plaintiff's substantial rights.

### 4.     The ALJ did not Err in Determining that Plaintiff's Past Relevant Work was as a Cashier.

Plaintiff also claims that the ALJ incorrectly characterized her past relevant work as that of a cashier.  (D.E. 11, at 10).  In her initial application for benefits, she described herself as a restaurant manager, explaining that

> I worked for my in-laws in their restaurant.  When they were not there I had to do everything.  If someone did not show up then I had to fill in for the cook, waitress, etc. or whoever was not there.

AR at 140.  However, at the administrative hearing, plaintiff explained that "I would charge the people when they go pay their tickets."  Id. at 378.  Immediately thereafter, she twice agreed that she would be considered the cashier.  Id. at 378-79.  While plaintiff may no longer be able to perform the extra duties she undertook at her in-laws' restaurant, the ALJ is permitted to focus on how a

position is generally performed in the national economy, rather than how a claimant actually performed it.  See Villa, 895 F.2d at 1022.  Therefore, it is respectfully recommended that the ALJ's determination that plaintiff's past relevant work was as a cashier comports with the applicable law.

### 5.   The ALJ Properly Evaluated Plaintiff's Subjective Complaints of Pain.

Finally, plaintiff claims that the ALJ did not properly evaluate her subjective complaints of pain.  (D.E. 18, at 2-3).  Social Security Ruling ("SSR") 96-7P describes how the Commissioner is to evaluate subjective symptoms and to determine the credibility of an individual's statements.  SSR 96-7P, 1996 WL 374186 (S.S.A.); see also Beck v. Barnhart, 205 Fed. Appx. 207, 212-13 (5th Cir. 2006) (per curiam) (unpublished) (evaluating ALJ's decision according to SSR 96-7p).  According to this ruling, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms.  SSR 96-7P, 1996 WL 374186, at *1.  The ALJ must next evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's abilities to do basic work activities.  Id.  If the individual's statements regarding the intensity, persistence, or

functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ determines credibility by considering the record as a whole, including medical signs and laboratory findings; the individual's own statements about the symptoms; any statements or other information provided by treating or examining physicians, psychologists, or other persons about the symptoms and how they affect the individual; and any other relevant evidence.  Id.

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence, SSR 96-7P establishes seven factors, outlined in 20 C.F.R.    §§ 404.1529(c) and 416.929(c), which the ALJ should consider: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms, such as lying flat, standing for fifteen to twenty minutes every hour, or sleeping on a board; (7) any other factors concerning the individual's functional limitations and restrictions due

to pain or other symptoms.  SSR 96-7P, 1996 WL 374186, at *3.

Finally, SSR 96-7P addresses the standard for making credibility
determinations.  Id. at *4.  An ALJ's credibility determination cannot be based on
an intangible or intuitive notion about an individual.  Id.  The reasons for the
credibility finding must be grounded in the evidence and articulated in the
determination or decision.  Id.  It is not sufficient to make a conclusory statement
that "the individual's allegations have been considered" or that "the allegations are
(or are not) credible."  Id.  The determination or decision must contain specific
reasons for the finding on credibility, supported by the evidence in the case record,
and must be sufficiently specific to make clear to the individual and to any
subsequent reviewers the weight the adjudicator gave to the individual's statement
and the reasons for that weight.  Id.  This documentation is necessary in order to
give the individual a full and fair review of his or her claim, and in order to ensure
a well-reasoned determination or decision.  Id.

The ALJ found that plaintiff suffered from a medically determinable
impairment that could reasonably produce her alleged symptoms.  Id. at 262ZC.
However, her "statements concerning the intensity, duration, and limiting affects of
these symptoms are not entirely credible beginning on May 5, 2002."  Id.  The ALJ
explained that

The claimant's testimony was evaluated and compared with prior statements and other evidence.  It is the conclusion of the [ALJ] that the pain experienced by the claimant is limiting, but when compared with the total evidence, not severe enough to preclude all types of work.  The current medical evidence does not support the claimant's complaints of an inability to perform any activity due to pain.  The examination of November 4, 2002 found no limitations due to pain or any other cause.  Since May 2002 no physician has expressed an opinion that the claimant was unable to work due to impairments.  In his letter of June 23, 2004, Dr. Trevino [treating physician][7] did not give an opinion as to claimant's limitations, if any.  The claimant admits she receives significant pain relief from her medications and injections with no side effects.

Id.  The ALJ further explained that

While the claimant complains of severe pain, it does not seem reasonable to conclude from the minimal findings in evidence that such could be the basis for the degree of pain alleged.  She does not appear to be experiencing progressive physical deterioration which might be expected when there is intense and continuous pain.  Likewise, the claimant's routine does not appear restricted by her alleged disability, rather by choice....  The evidence of record fails to demonstrate the presence of any pathological clinical signs, significant medical finding, or any neurological abnormalities which would establish the existence of a pattern of pain of such severity that would contraindicate claimant's engaging in all substantial gainful activity.  Moreover, the [ALJ] finds the allegation of pain of an extent as to be disabling

_____

[7] Brackets in original.

> is neither persuasive nor credible and therefore cannot be
> found as fact.

Id.  The ALJ thus gave specific reasons for finding that plaintiff's allegations of

disabling pain were not credible.  Accordingly, it is respectfully recommended that

the ALJ's decision comports with the legal standards relevant to plaintiff's

allegations of disabling pain.

## V.  RECOMMENDATION

It is respectfully recommended that plaintiff's motion for summary

judgment, (D.E. 11), be denied, and that defendant's cross-motion for summary

judgment, (D.E. 17), be granted.

Respectfully submitted this 18th day of March 2008.

_____

BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(C); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error*, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).